IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

TIMOTHY WAYNE KEMP                                          PETITIONER

v.                                No. 5:03-cv-55-DPM

WENDY KELLEY, Director, ADC                          RESPONDENT

## ORDER

1. **Background.** The overarching question is whether Tim Kemp is
entitled to a writ of *habeas corpus* invalidating his capital murder convictions
or his death sentences. In 1994, a jury convicted Kemp of murdering Wayne
Helton, Richard "Bubba" Falls, Robert "Sonny" Phegley, and Sonny's
daughter, Cheryl Phegley. The jury imposed four death sentences. On direct
appeal, the Arkansas Supreme Court affirmed all the convictions and the Falls
death sentence. The Court reversed the remaining three sentences. *Kemp v.
State (Kemp I)*, 324 Ark. 178, 919 S.W.2d 943 (1996). At Kemp's 1997
resentencing, a second jury decided that death was the appropriate
punishment for the other three murders too; and the Supreme Court affirmed.
*Kemp v. State (Kemp II)*, 335 Ark. 139, 983 S.W.2d 383 (1998). This Court's
Orders, № *68* and *107,* summarize the evidence and the procedural history.
Having exhausted his state remedies, Kemp seeks federal *habeas* relief. The

Court is proceeding on Kemp's second amended petition for the writ, № 81, a paper of many interwoven claims and subclaims. Appendix A lists them.[*]

In June 2012, the Court dismissed Claims I.H, VII, VIII, XIII, XIV, XV, XVI on the merits and rejected three arguments for excusing procedural default on some of the remaining claims. № 68. In light of *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), the Court granted reconsideration and vacated the parts of Order № 68 holding that ineffective assistance of trial counsel can never excuse procedural default. № 101. In August 2014, the Court partly granted and mostly denied Kemp's motion for an evidentiary hearing on cause to excuse procedural default. The Court granted the hearing solely on Kemp's claims of ineffective assistance of trial counsel arising from alleged mental illness, organic brain damage, and childhood trauma. The Court also granted Kemp's motion to reconsider Claim XIV on two intertwined issues. № 107. The Court heard eight days of evidence, received post-hearing briefs, and heard oral argument.

---

[*]The Court has revised Appendix A. The final version is more specific in some places than the original, which was appended to the Court's August 2014 Order, № 107.

Kemp's many intertwined claims, which have been ably and zealously pressed by his current lawyers, and the onion-like layers of *habeas* law, have necessitated a long opinion. A summary in plain words is needed.

**2. Summary.** No one has ever really disputed that Kemp killed four people. The essentially undisputed evidence about what happened that night makes this conclusion inescapable. After a day of drinking heavily and partying, Kemp and Becky Mahoney, his girlfriend, got into it. They fussed about whether it was time to leave a gathering at Wayne Helton's trailer. Drinking excessively and carousing had long been part of Kemp's life. As he told an examiner at the Arkansas State Hospital, "[t]hat's the way I was raised. My daddy drank and everything, and got away with it all. I thought I could too." Petitioner's Exhibit 104 at 28. Jealously was another subtext—Becky and Helton had been paying attention to each other. Cheryl Phegley sided with Becky and encouraged her to stay; the others pushed Kemp to go. Given that everyone was intoxicated from one thing or another, these exchanges were undoubtedly rough, not gentle. According to Becky, "before [Kemp] drove out, he hollered and said I'll be sorry for not leaving." Resentencing Record, 885.

Kemp acted on his words. He drove around — either around the area, or back to his mother's house, where he and Becky lived. He got his .22 rifle. He went back to the trailer. His truck was loud, with a recognizable sound, so he parked some distance away, walked to the trailer door, and knocked.

When Helton opened the door, Kemp shot him four times. As Kemp would tell his friend Bill Stuckey later that night, Helton hit the ground "like a sack of taters." Resentencing Record, 1034. Kemp then shot Sonny Phegley and Bubba Falls, whom Kemp told Stuckey was just in the wrong place at the wrong time. Trial Record, 1549. Kemp went after Cheryl, who was crawling down the hall. She was screaming, "Oh God, she was gonna die." Kemp responded — again as related by Stuckey — by assuring her that "Yes, she was going to die." Resentencing Record, 1034. Becky was hiding in a closet. Kemp didn't find her. As he left, he heard some of the victims "gasping for breath." Trial Record, 1552. Kemp drove to Stuckey's house to get gas money to leave town. The police arrested him there a few hours later.

Faced with these facts, Kemp's lawyers essentially conceded guilt, focusing instead on what degree of murder, and what punishment, fit the crimes. In the resentencing proceeding, again the lawyers' focus was securing

-4-

a punishment less than death based on all the circumstances. All this was understandable and reasonable. The defense theory was that a heavily intoxicated person, whose personality had been misshapen by an abusive and violent upbringing, overreacted and lashed out in imperfect self-defense. The juries rejected this defense. They adopted the State's view: Kemp deserved to lose his life for choosing to take four lives.

To tell the story of this case is to answer many of Kemp's arguments. He's not actually innocent of capital murder or the death penalty. The Arkansas Supreme Court's rejection of the various errors presented to it, and related points, wasn't contrary to clearly established federal law or an unreasonable application of that law. Kemp's many arguments about things said and done, and things not said or done, are at the margin. Kemp's new arguments, which he didn't make to the state courts, fail for the reasons explained below. Most importantly, none of these points would've made any difference in the verdicts; they cannot overcome the undisputed, powerful, and sad story of what happened that night. In the law's word, omitting the new arguments worked no prejudice.

Guided by recent United States Supreme Court decisions, this Court held the evidentiary hearing to determine if Kemp's trial lawyers were constitutionally ineffective for not sufficiently investigating or presenting evidence about Kemp's abuse-permeated childhood, fetal-alcohol exposure, or post-traumatic stress disorder. The record presented was compiled in a decade-plus effort. It is compelling. But there's no reasonable possibility that all this new evidence would have changed the original jury's guilty verdicts. The facts of that night are simply more compelling than Kemp's background. On the penalties, all the new mitigating evidence probably would have avoided the death sentences by persuading one or more jurors to insist on life without parole. One vote would have made the difference.

Stepping back in time, though, into the place of trial counsel in 1994 and 1997, they performed adequately, not deficiently. There wasn't enough information at hand to prompt counsel to investigate fetal-alcohol exposure. The lawyers found evidence of child abuse and presented it capably. The situation was much worse than they discovered. But not broadening their investigation to collateral family members was reasonable in the circumstances. Kemp's brother refused to cooperate at all; his mother

cooperated, but didn't tell the whole story; Kemp cooperated; and the lawyers presented what they had, which persuaded some jurors in part. None of the surrounding circumstances would have alerted a reasonable lawyer that more investigation of Kemp's father and his various families was needed or that post-traumatic stress disorder should have been pursued.

One might conclude, especially with a person's life in the balance, that a new trial on sentencing is the best way to make sure of a just result under law. That conclusion has pull. But it avoids the hard question: setting aside what we know now, did Kemp's lawyers act so unreasonably and deficiently in the circumstances then presented that the Constitution was violated? The answer to that hard question is, in this Court's opinion, no. And because his trial lawyers were not constitutionally ineffective, the law bars Kemp from making new arguments about his childhood now, even though those arguments probably would have changed his sentences. The Court will enter judgment denying Kemp's petition for the writ.

**3. Resolution Of Claims On The Merits.** The merits standard is settled law. *№ 68 at 8-10.* The Court will address parts of Claims IV.A and IX.A on the merits because Kemp fairly presented these arguments to Arkansas

courts. The rest of these two claims, as well as Claims XI.A and XII.D, raise tangled issues of procedural default. Because resolving them on the merits is more efficient, the Court takes that route. 28 U.S.C. § 2254(b)(2); *McKinnon v. Lockhart*, 921 F.2d 830, 833, n.7 (8th Cir. 1990) (*per curiam*).

### A. Did The Prosecutor's Remarks At The 1994 Trial Deny Kemp A Fair Trial?

Kemp argues the prosecutor said things at the guilt phase of his 1994 trial that were overwhelmingly prejudicial, rendering his trial fundamentally unfair. This is Claim IV.A.

First, during closing, the prosecutor referred to Helton's family having heard Dr. Frank Peretti's testimony. Dr. Peretti was the forensic examiner. The prosecutor said:

> Wayne Helton is shot twice in the body and he's going to die from those gunshot wounds. And I know that his family, when they heard Dr. Peretti testify, that they just prayed he was already dead . . .. Trial Record, 1760.

Outside the jury's presence, defense counsel immediately moved for a mistrial or an admonition. He argued the impropriety of invoking someone's feelings who may or may not have heard Dr. Peretti's testimony. The prosecutor responded that she was merely arguing that Helton's wounds

were fatal. The trial court denied a mistrial and admonished the jury to disregard references to anyone's feelings that weren't in evidence.

Kemp now contends that the prosecutor's remarks were improper and misleading because Helton's family wasn't even at the trial. He argues that the trial court's statement was insufficient to cure the resulting prejudice and a mistrial was required. In *Kemp I*, the Arkansas Supreme Court held that the prosecutor's statement wasn't serious enough to require a mistrial and that the admonition cured any prejudice. *Kemp I*, 324 Ark. at 197-98, 919 S.W.2d at 952.

The Arkansas Supreme Court's decision wasn't contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d). Habeas relief is appropriate only when "the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quotation omitted). The prosecutor's comments must be "so egregious that they fatally infected the proceedings and rendered [Kemp's] entire trial fundamentally unfair." *Stringer v. Hedgepeth*, 280 F.3d 826, 829 (8th Cir. 2002). The prosecutor slipped here. But the remark was marginal, not egregious; it

didn't deprive Kemp of a fair trial.   The trial court's admonition was sufficient.

Second, Kemp contends that the prosecutor made other inflammatory remarks during opening statement and rebuttal closing, which rendered his 1994 trial fundamentally unfair.  Here's Kemp's list.

- Describing the murders as a "slaughter" of unsuspecting victims, who couldn't defend themselves. Trial Record, 1287-88.

- Stating that Stuckey's testimony will "make your blood chill." Trial Record, 1292.

- Responding to Kemp's closing argument with a personal assault and sarcasm—"I couldn't wait to hear—I absolutely could not wait to hear the reason [Kemp's counsel] was going to give you why this should not be premeditation and deliberation. I was on the edge of my seat over there, dying to hear what reason he was going to give you . . .." Trial Record, 1752-53.

- Stating that there is "absolutely no excuse" for the "slaughter" that occurred in the trailer.  Trial Record, 1755.

- Repeatedly stating that Cheryl was brave on the night of the murders—for standing up to Kemp, for defending Mahoney, and for fighting for her life after Kemp shot her. Trial Record, 1758.

- Asking why Kemp shot Cheryl and referring to her as a "little girl," though she was in her twenties. Trial Record, 1758.

Kemp didn't challenge any of these statements on direct appeal. And the Arkansas Supreme Court didn't rule on whether the comments deprived him of a fair trial. His claims related to them are thus defaulted. There's no need, however, to analyze whether his default may be excused: each comment was minor, not egregious. None of them made Kemp's trial fundamentally unfair. It was the prosecutor's duty to zealously press the charges. She did. Claim IV.A fails.

### B. Did The Prosecutor's Remarks At Resentencing Deny Kemp A Fair Trial?

Kemp also argues that the prosecutor said things that made his resentencing trial fundamentally unfair. This is Claim IX.A.

First, Kemp contends that the prosecutor twice injected her personal opinion in closing. The Arkansas Supreme Court addressed these remarks in *Kemp II*, 335 Ark. at 144, 983 S.W.2d at 385-86. The prosecutor referred to Kemp's pattern of not taking responsibility for his actions: "And I think that is one of the most telling things about this defendant." Resentencing Record, 1167-68. Counsel moved for a mistrial or an admonition. The trial court rejected a mistrial, but admonished the jury not to be persuaded by any lawyer's opinion. The prosecutor later argued that, because all twelve shots

Kemp fired hit a victim, he wasn't acting like someone who was "intoxicated or blacked out or just shooting wild." The prosecutor then stated, "and I know you already figured that out. So, I know that when you go back with these forms and you check…." Resentencing Record, 1172-73. Counsel made the "same objection" as before, and the trial court overruled it. *Ibid.*

The Arkansas Supreme Court rejected Kemp's contention that the opinion statements justified a mistrial. The Court held the comments were harmless and the admonition sufficient. *Kemp II*, 335 Ark. at 144, 983 S.W.2d at 386. That ruling wasn't contrary to, or an unreasonable application of, clearly established federal law. Because the comments aren't egregious, they didn't make Kemp's resentencing fundamentally unfair. *Stringer*, 280 F.3d at 829.

Second, Kemp argues that the prosecutor made other prejudicial remarks. He says that, with these comments, the prosecutor preyed on the jurors' fears, kindled their passions, disparaged mitigation notwithstanding supporting evidence, or argued facts not supported by evidence. Here's Kemp's list on this point.

- "It's hard to take these pictures and look at each one of them . . .. It's safer to be at home or be at work or be

somewhere other than here looking inside this trailer, looking into what happened to these people . . . . It's one of those things you don't want to know about." Resentencing Record, 1163-64.

- "I think [the mitigation evidence] is so incredible . . .." Resentencing Record, 1166.

- Kemp's statement that he was threatened by the victims was a "pack of lies." Resentencing Record, 1167.

- Kemp left the trailer to go home and get his gun. Resentencing Record, 1170.

Kemp's claims about these comments are defaulted because he didn't object. And the Arkansas Supreme Court didn't rule on whether the comments deprived him of a fair trial. Again, though, addressing whether Kemp can overcome the default is unnecessary. None of these comments is so egregious that they made Kemp's resentencing fundamentally unfair. *Stringer*, 280 F.3d at 829. Claim IX.A lacks merit.

### C. Was Trial Counsel Ineffective By Not Challenging Victim-Impact Testimony?

Kemp next attacks his trial lawyers' decisions about victim-impact testimony during the 1994 penalty phase and the 1997 resentencing. These are Claims XI.A and XII.D.

-13-

At the penalty phase, the prosecutor offered testimony from five family members: Roberta Sullivan and Jerri Fletcher (Sonny Phegley's sisters and Cheryl Phegley's aunts); Rhonda Darby (Sonny's daughter and Cheryl's sister); and Kelly and Kerri Falls (Richard Falls' sisters). In *Kemp I*, the Arkansas Supreme Court held that the testimony of all these witnesses was not so unduly prejudicial that it made Kemp's trial fundamentally unfair. *Kemp I*, 324 Ark. at 205-06, 919 S.W.2d at 957. Only two of these family members—Sullivan and Fletcher—testified at resentencing. In *Kemp v. State*, 348 Ark. 750, 766-67, 74 S.W.3d 224, 232-33 (2002) (*Kemp III*), the Supreme Court rejected Kemp's argument that the victim-impact testimony during both the penalty phase and resentencing made his trial fundamentally unfair. The Court held that it had decided the same issue in *Kemp I*, and declined to decide differently.

Kemp's argument in Claim XI.A—his lawyer was ineffective during the 1994 penalty phase for abandoning his sustained objection to Rhonda Darby's testimony—lacks any merit. Kemp himself agreed that Darby could testify even though the prosecutor hadn't listed her as a potential witness. Trial Record, 1793. Darby's testimony was brief and not particularly compelling:

she wasn't close to either her sister or her father. Trial Record, 1867-69. More importantly, Kemp's death sentences for both Phegleys were vacated in *Kemp I*; and Darby didn't testify in the 1997 resentencing trial, which produced the now-challenged death sentences for the Phegleys' murders. Claim IX.A fails.

In Claim XII.D, Kemp argues that counsel was ineffective at resentencing for not objecting to Sullivan's testimony or Fletcher's. Sullivan described her brother, Sonny Phegley, as one of the most important people in her life. She said that her niece, Cheryl, was more like a daughter to her. Cheryl lived with Sullivan for several years, beginning at age three. Fletcher testified that she was angry about Sonny's death and missed him. She referred to dealing with her mother's recent death and losing time with Sonny because of her military service. Kemp contends that counsel should have objected and argued that all this testimony was emotionally charged and unduly prejudicial. Fletcher's words, in particular, Kemp continues, inflamed the jury's passions and went beyond appropriate victim-impact evidence. Kemp says that, to the extent *Kemp III* has any bearing on this ineffectiveness claim, the Arkansas Supreme Court's decision was unreasonable.

Kemp is mistaken. First, trial counsel made several general challenges to all the victim-impact testimony, which the trial court rejected. Trial Record, 90-94, 282-87, 297, 1782, 1861; Resentencing Record, 68-73, 149-52. Second, Sullivan's testimony and Fletcher's was compelling because they lost close family members. By definition, victim-impact testimony is freighted with emotion in such circumstances. But the Phegley relatives' testimony was not "so unduly prejudicial that it render[ed] the [resentencing] fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). The Arkansas Supreme Court's holding, therefore, was not contrary to, or an unreasonable application of, clearly established federal law. The Court need not analyze whether the Arkansas Supreme Court reached the specific issue raised here because Kemp can't show that counsel's decision amounted to deficient performance under *Strickland v. Washington*, 466 U.S. 668 (1984). The victim-impact testimony didn't exceed constitutional bounds. And counsel's failure to make a meritless objection wasn't ineffective assistance. *Dodge v. Robinson*, 625 F.3d 1014, 1019 (8th Cir. 2010). Claim XII.D fails.

**4. Resolution Of Procedurally Defaulted Claims.** Kemp's remaining claims are defaulted. These are claims of ineffective assistance, prosecutorial

misconduct, and trial error. Kemp's expanded procedural arguments on reply for excusing procedural default fail for the same reasons stated in the Court's Order № 68 at 25-26. This Court may consider these claims only if Kemp can show (1) cause for the default and actual prejudice, or (2) that the default will result in a fundamental miscarriage of justice. *№ 68 at 8; Sawyer v. Whitley*, 505 U.S. 333, 338-39 (1992); *Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991).

The Court's Order *№ 68* summarized the cause-and-prejudice standard. *McCleskey v. Zant*, 499 U.S. 467, 493 (1991); *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986). And the Court has recognized that cause may exist to excuse the default of an ineffective-assistance-of-trial-counsel claim if the claim is substantial and post-conviction counsel was ineffective in not raising it. *№ 101 at 2; Trevino*, 133 S. Ct. at 1921; *Martinez v. Ryan*, 132 S. Ct. 1309, 1318 (2012). A substantial claim is one that has "some merit." *Martinez*, 132 S. Ct. at 1318.

**A. Claims Not Considered At The Evidentiary Hearing.** Most of Kemp's defaulted claims weren't part of the hearing or related to hearing issues. They're listed in Appendix A: Claims I.C, D, E, F, G, I, J, K, and L; II,

-17-

III, IV. B, C, D, and E; VI; IX.B and C; X; XI.B and parts of E and F; XII.E and F, and parts of A and G; XIV (reconsidered claims); and XVII. To keep the analysis as clear as possible, the Court will deal with this thicket of claims out of order.

**Assistance Of Competent Mental Health Expert.** There is no cause to excuse Kemp's defaulted claim that he was denied the effective assistance of a competent mental health expert. This is Claim II. Kemp hasn't shown that "some objective factor external to the defense impeded counsel's efforts to raise the claim in state court." *McCleskey*, 499 U.S. at 493 (quotation omitted).

**Ineffectiveness Claims Rejected As Stand-Alone Claims.** Kemp raises several ineffectiveness claims that the Court has already dismissed as stand-alone claims. *№ 68 at 15-22.* These are Claims I.L and parts of XI.F and XII.G. He argues that trial counsel didn't protect his right to a fair and impartial jury, or shield him from certain aggravating circumstances, and didn't fully litigate or preserve claims that Arkansas's capital sentencing scheme is unconstitutional.

Under *Martinez/Trevino*, Kemp must show that these claims have some merit under the *Strickland* standard of deficient performance and prejudice.

-18-

In making his ineffectiveness arguments, Kemp refers only to each rejected stand-alone claim; he hasn't shown how trial counsel's performance was deficient.   Moreover, counsel's failure to raise a meritless claim was not ineffective performance. *Dodge*, 625 F.3d at 1019. These ineffectiveness claims aren't substantial; therefore, Kemp's procedural default is not excused. Claims I.L, and parts of Claims XI.F and XII.G fail.

**Remaining Non-Hearing Claims.** These claims fall in two groups: (1) ineffective assistance of trial counsel implicating *Martinez/Trevino*; and (2) prosecutorial misconduct, trial error, and ineffective assistance of appellate counsel.   The threshold issue with all these non-hearing claims is prejudice.

**No Prejudice.** The record contains overwhelming evidence against Kemp on the elements of capital murder and the aggravating factors supporting the death sentences. № 68, 107. This evidence is outlined at pages 3-4, *supra*. Kemp's trial strategy was that he acted in self-defense, imperfect self-defense, or under an extreme emotional disturbance. The core of Kemp's argument in these defaulted claims is that the jury was unable to consider evidence supporting his defenses, was exposed to prejudicial evidence and argument, and heard much evidence that wasn't credible. These interwoven

claims are based on unpresented evidence that Kemp argues would have changed the outcome of his case.  Here's the evidence most emphasized by Kemp.

- Stuckey's and Mahoney's criminal records and motivation for aiding the prosecution;

- Mahoney's alleged incompetence—mental retardation, major depressive disorder, post-traumatic stress disorder, and severe substance abuse—that could have affected her ability to retain and recall events;

- Some victims' violent reputations;

- A rifle in the trailer that didn't belong to Kemp;

- No testing of the pistol found at the crime scene to determine whether it had been fired;

- Gunshot residue tests that the prosecution had, but didn't share, which showed residue on three of the four victims' hands;

- Statements that Mahoney made to the prosecution:  Helton had been messing with Kemp on the night of the shooting; Helton had a pistol, which he planned to use to scare Kemp if he returned; and Kemp left the trailer for only a few minutes before returning to shoot the victims;

- Statements that Stuckey made to the prosecution about what Kemp told him:  the people at the trailer ran him off and kept Becky; he was outnumbered; and he didn't want to leave town without Becky;

- Statements that Stuckey made to the prosecution showing that he included new details in his testimony;

- Lillie Kemp's undisclosed 1984 DWI conviction;

- The victims' families supported the imposition of life sentences; and

- Kemp's police statement, introduced only at the 1997 resentencing.

Kemp's claims also rely on arguments and evidence that he contends either shouldn't have been admitted or should have been addressed by trial counsel: the forensic examiner's testimony about how Helton may have been killed; the 911 call; and the argument about Kemp's future dangerousness.

This Court considered many of these claims when it denied Kemp's request for an evidentiary hearing on them. Kemp simply hasn't shown *Strickland* prejudice for most of these ineffectiveness claims. № *107 at 3*. And the Court couldn't hold a merits hearing on Claims III, IV, IX, and XVII because Kemp didn't present new facts establishing — by clear and convincing evidence — that no reasonable juror would have found Kemp guilty but for constitutional error. № *107 at 6-8*; 28 U.S.C. § 2254(e)(2).

The Court's prior Order reviewed much of Kemp's list of allegedly trial-changing evidence. Whether the group had been taunting and provoking

Kemp before he left the trailer is immaterial given the time Kemp had to cool off before returning to the trailer and shooting everyone. This conclusion holds whether Kemp just drove around a few minutes before returning (as Kemp told police) or went home, got his gun, and returned (as Kemp told Stuckey). There was more than enough evidence, even without Mahoney's testimony, for the jury to find Kemp guilty. The crime scene materials, coupled with Stuckey's testimony about Kemp's admissions that night, were the case. And the fact that there was gunshot residue on some of the victims' hands—without anything connecting that residue to some provoking event—wouldn't have changed the case's outcome. № 107 at 7-8.

**Ineffectiveness Claims.** *Martinez/Trevino* applies to the first category of claims—ineffective assistance of trial counsel. A substantial ineffectiveness claim under *Martinez/Trevino* requires a showing of *Strickland* prejudice—"a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

For the purpose of this analysis, the Court assumes that Kemp has made a sufficient showing that post-conviction counsel was ineffective. His work was cursory; he relied almost exclusively on trial counsel's evaluations

without any independent investigation. There's no need, however, to tarry over post-conviction counsel's performance. To evaluate prejudice, the Court must press forward to trial counsel's work.

Kemp hasn't demonstrated that he was prejudiced in the *Strickland* sense by any of the alleged errors raised in these ineffectiveness claims. No reasonable probability exists that, absent these alleged errors, the outcome on guilt, sentencing, or resentencing would have been different. *Strickland*, 466 U.S. at 694. Even if the evidence and argument had been presented, or excluded, as argued by Kemp here, the juries' findings of guilt and on sentencing would have been the same. Kemp hasn't shown that any non-hearing ineffectiveness claim is substantial; and *Martinez/Trevino* therefore can't open the door for merits consideration of these claims.

**Prosecutorial Misconduct, Trial Error, and Appellate Ineffectiveness Claims.** The *Martinez/Trevino* equitable exception doesn't extend to the second category of claims—prosecutorial misconduct, trial error, or ineffective assistance of appellate counsel. *Martinez*, 132 S. Ct. at 1318-19; *Dansby v. Hobbs*, 766 F.3d 809, 833-34 (8th Cir. 2014), *cert. denied*, 2015 WL 5774557 (5 October 2015). On these claims, the procedural-default prejudice element

requires Kemp to show that the alleged errors "worked to his *actual* and substantial disadvantage, infecting his trial with error of constitutional dimensions." *Murray*, 477 U.S. at 494 (emphasis original).  The prejudice required to excuse a procedural default is either the same as *Strickland* prejudice or greater.  *Armstrong v. Kemna*, 590 F.3d 592, 606 (8th Cir. 2010); *Clemons v. Luebbers*, 381 F.3d 744, 752, n. 5 (8th Cir. 2004).  Kemp hasn't made a sufficient showing.  He hasn't demonstrated that his trial, *or his appeal*, was "infect[ed] . . . with error of constitutional dimensions." *Murray*, 477 U.S. at 494.  And, as with the non-hearing ineffectiveness claims, the outcome would have been the same even if the argument and evidence had been presented, or excluded, as Kemp argues. *Nims v. Ault*, 251 F.3d 698, 702-03 (8th Cir. 2001), *superseded on other grounds by* 28 U.S.C. § 2244(b)(2).  He likewise hasn't made a sufficient showing about prejudice from alleged appellate ineffectiveness.

On reply, Kemp requests a stay to return to state court to seek *coram nobis* relief on claims of prosecutorial misconduct—Claims IV, IX, and XVII. № 109 at 3-4.  The Arkansas Supreme Court has already denied *coram nobis* relief without an opinion. № 42-12.  And this Court rejected Kemp's request

for an evidentiary hearing on Claims IV and IX. *№ 107.* Kemp hasn't established that he was unable to develop the new facts about alleged prosecutorial misconduct in state court despite diligent efforts to do so; and these facts wouldn't change the outcome of the case. *№ 107 at 6-8.* Kemp's request to return to state court is therefore denied as futile. Kemp hasn't provided good cause for his failure to exhaust, and these claims are "plainly meritless." *Rhines v. Weber,* 544 U.S. 269, 277 (2005).

Claims I.C, D, E, F, G, I, J, K; III; IV.B, C, D, E; VI; IX.B, C; X; XI.B, parts of E and F; XII.E and F, and parts of A and G; XIV (reconsidered claims); and XVII fail.

**B. Claims Considered At The Evidentiary Hearing.** There are two questions on the remaining defaulted claims. First, did Kemp's trial lawyers meet "the constitutional minimum of competence" in investigating and presenting evidence of Kemp's alleged mental illness, organic brain damage, and childhood trauma? *Bobby v. Van Hook,* 558 U.S. 4, 5 (2009) (*per curiam*). Second, was Kemp prejudiced by any deficiency on this score during the guilt phase, the penalty phase, or at resentencing? *Strickland,* 466 U.S. at 692. The Court held a hearing on Claims I.A, XI.E, and XII.A. Related

ineffectiveness claims are Claims I.B, XI.C, D, and part of F, XII.B, C, and part of G.

At the hearing, Kemp presented compelling evidence not introduced at trial: a deep family history of poverty and mental illness; a routine of trauma during childhood; and Kemp's mother, Lillie, drank alcohol heavily when she was pregnant with him. Kemp offered new experts: Dr. Paul Connor, a neuropsychologist; Dr Richard Adler, a psychiatrist; Dr. Natalie Novick Brown, a psychologist; and Dr. George W. Woods, a psychiatrist. They testified that, as a result of *in utero* exposure to alcohol, Kemp has organic brain damage, which impairs his executive functioning and behavior control, especially in unfamiliar and stressful situations. At the time of Kemp's 1994 trial, the term for this diagnosis was fetal alcohol effects; by Kemp's 1997 resentencing, the term was partial fetal alcohol syndrome.

Dr. Woods also testified that Kemp suffers from post-traumatic stress disorder caused by a childhood filled with physical, psychological, and emotional abuse. This disorder, according to Dr. Woods, prompts dissociation, paranoid ideation, an exaggerated startle response, and hyperreactivity in Kemp. And there was evidence of Kemp's diagnosis of

depression and substance abuse. Dr. Woods concluded that, on the night of the murders, Kemp's organic brain damage and post-traumatic stress disorder caused him to lose contact with reality and respond irrationally. Dr. Brown echoed the point. She said the effects of fetal alcohol and post-traumatic stress disorder interacted synergistically, affecting Kemp's ability to control his thoughts and behavior.

**On Guilt Or Innocence.** Here, the answer to the prejudice question is dispositive. There is no reasonable probability that all this new evidence would have made any difference on Kemp's guilt or innocence. *Strickland*, 466 U.S. at 695. Even if Kemp's lawyers had presented it, there is no reasonable probability the trial court would have found that Kemp lacked the mental capacity to conform his conduct to the requirements of the law or to appreciate the criminality of his conduct as a result of mental disease or defect. ARK. CODE ANN. § 5-2-313. Nor is there a reasonable probability that the jury would have found Kemp lacked the mental capacity to act with a premeditated and deliberate purpose. ARK. CODE ANN. § 5-10-101.

Overwhelming evidence existed that Kemp had the mental capacity to be tried for, and found guilty of, capital murder. His actions demonstrated

he could and did form the requisite intent. The jury heard all this: Kemp returned to Helton's trailer because he was angry at three of the victims, particularly Cheryl, for running him off; to avoid detection, he parked his truck down the road and came through the woods to the trailer with his rifle; he fired twelve shots into the four victims; he shot Helton four times, including once at close-range in the left lip; he followed Cheryl down the hall, and shot her five times, telling her that she was going to die; and then Kemp went to a friend's house to borrow gas money so he could leave town. *Kemp I*, 324 Ark. at 187-89; 919 S.W.2d at 946-48. These calculated actions are not those of a mentally incapacitated person. They bear the hallmarks of premeditation and deliberation.

Kemp hasn't demonstrated a substantial claim of prejudice in his conviction. The *Martinez/Trevino* exception therefore doesn't allow the Court to consider the related ineffectiveness claims on the merits.

**On The Sentences.** The harder question is whether Kemp's claims of ineffectiveness during the penalty phase and during resentencing are substantial. Again, Kemp must satisfy both the performance and prejudice elements under *Strickland*.

Kemp has, the Court concludes, demonstrated a substantial claim of prejudice during both sentencing proceedings. "[T]he Constitution requires that the sentencer in capital cases must be permitted to consider any relevant mitigating factor." *Porter v. McCollum*, 558 U.S. 30, 42 (2009) (*per curiam*) (quotation omitted). There's a reasonable probability that at least one juror would have voted for a life sentence if Kemp's lawyers had presented the expanded mitigation case during the penalty phase and at resentencing. *Strickland*, 466 U.S. at 695. Instead of arguing mitigation based on organic brain damage and PTSD, their theory was this was aberrational, drunken conduct. Hearing Record, 809-10.

Kemp's lawyers presented some mitigation evidence on the issues of Kemp's childhood trauma and diminished capacity. In the penalty phase, Lillie testified that Kemp's father, Verlon, physically abused him. And Dr. James Moneypenny, a psychologist, testified that he had diagnosed Kemp with substance abuse and a personality disorder with prominent antisocial features—characterized by poor impulse control, lack of empathy, and an inability or unwillingness to conform to behavior expectations. Dr. Moneypenny said that Kemp's disorder and intoxication affected his decision-

making on the night of the shootings; Kemp was less able than the average person to control his impulses, consider the consequences of his actions, or think through the situation logically and reasonably. According to Dr. Moneypenny, measured against someone else, Kemp was angrier and more hostile, more sensitive to insults, more likely to feel threatened, and more likely to act excessively against his best interests. Trial Record, 1900-11.

Both Lillie and Dr. Moneypenny testified similarly at resentencing, though much less effectively. Perhaps it was the passage of time, or the fact that the proceeding was the second time through. But the transcript, Resentencing Record, 1047-58, 1074-87, shows counsel working harder and getting less from both these witnesses.

Kemp's expanded evidence, however, is significantly more compelling than what was presented at either the first trial or the resentencing trial. By live testimony and affidavit, family members told a horrible story. Kemp's childhood was marked by constant abuse—physical, psychological, and emotional. This abuse was both more affecting and more severe than presented during either sentencing proceeding. One of Kemp's cousins aptly described Verlon as "like Satan alive" when he was drinking. Hearing

Record, 541. He got drunk almost every weekend. After he was disabled, Verlon drank every day, starting before noon. Petitioner's Exhibit at 11, 1-2; Exhibit 12 at 1-2. Kemp's older brother said their father was a "monster." Petitioner's Exhibit 12 at 5.

Lillie's 2003 affidavit provides a much clearer and more detailed picture of Kemp's horrific childhood than any of her testimony. She explained Verlon's constant abuse and threats, the isolation from outsiders, and the fearful chaos that permeated the household. Lillie said that Kemp drank alcohol when he was a "little boy" because "it was the only way to survive the hell we lived in." Petitioner's Exhibit 15 at 6. She recounted telling Kemp to "keep his eyes on his daddy all the time, to make sure his daddy didn't try and kill me or one of them." Petitioner's Exhibit 15 at 9. Brad said that Lillie was "just as much to blame" as Verlon. She drank and fought with him, enduring regular abuse. She once ran off with Verlon, leaving the boys to shift for themselves for three weeks. Petitioner's Exhibit 11 at 3. Drs. Woods and Brown linked Kemp's fetal alcohol exposure and post-traumatic stress syndrome diagnoses to his actions on the night of the shooting. These experts

described, with thoroughness, how the PTSD exacerbated the poor functioning of Kemp's alcohol-damaged brain.

Kemp has not, however, satisfied *Strickland*'s performance element. He hasn't demonstrated that his lawyers were so deficient in investigating and presenting mitigation evidence that they were "not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. The Sixth Amendment isn't designed to "improve the quality of legal representation," but to make certain that a defendant gets a fair trial. 466 U.S. at 689. Kemp did.

Kemp offered published materials, including the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (February 1989), and the testimony of Professor Sean O'Brien, an experienced capital-defense attorney and law professor, as aids in evaluating attorney performance. As the Supreme Court has emphasized, however, the ABA standards are only guides. *Strickland*, 466 U.S. at 688-89; *Van Hook*, 558 U.S. at 8-9. "[T]he Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Van Hook*, 558 U.S. at 9. Professor O'Brien's testimony is admissible evidence on what a

reasonable capital defense attorney would have done in 1994 and 1997. But his testimony doesn't definitively answer the mixed question of constitutional law and fact that confronts the Court.

Kemp's lead lawyer candidly acknowledged that he failed to take steps that would have helped his client's mitigation case. He faulted himself for not digging deeper into family history and Lillie's drinking. He said, among other things:

- "I did not understand . . . how pervasive the abuse was." Hearing Record, 671.

- "I obviously didn't do enough and certainly didn't do what I would do nowadays, did not pick up the level of parent abuse that apparently there was." Hearing Record, 672.

- "I certainly didn't pick up on any fetal[-]alcohol issues, I can tell you that." Hearing Record, 677.

- "I clearly didn't ask the right questions [about fetal-alcohol issues] from what I understand you've now found, certainly didn't follow up enough on it." Hearing Record, 678.

- "Clearly my investigation, certainly looking back on it, was clearly insufficient and certainly not anywhere near as full as I would . . . do now." Hearing Record, 690.

- On not asking for money for an investigator: "[I]t's one of those things[,] looking back 20 years later, I cringe, I look at it and say I can't believe I didn't do that." Hearing Record, 710-11.

- "I did not pick up on the level of abuse, et cetera, that apparently you have . . . found, and clearly had I drilled down further, had enough time and resources, hopefully I would have." Hearing Record, 690-91.

In summary, as he confided in his colleague Professor O'Brien during a break in the evidentiary hearing, lead counsel now believes he mishandled this case. Hearing Record, 848-49. Acknowledging imperfect work is the honorable conclusion looking back across the much-expanded record. The Court must evaluate performance, though, without "the distorting effects of hindsight." *Strickland*, 466 U.S. at 689.

Kemp's lawyers had an obligation to investigate their client's background thoroughly. *Porter*, 558 U.S. at 39. "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304, 321 (2002). In evaluating the reasonableness of the investigation, "a court must consider not only the quantum of evidence already known to counsel, but also

-34-

whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

Kemp's lead counsel didn't fail to act "while potentially powerful mitigating evidence stared [him] in the face or would have been apparent from documents any reasonable attorney would have obtained." *Van Hook*, 558 U.S. at 11.  This is not a case like *Rompilla v. Beard*, 545 U.S. 374, 383 (2005), for example, where the lawyer knew the prosecutor was going to argue his client's criminal history as an aggravator, but didn't examine the available file on prior convictions.

Kemp's lead lawyer interviewed Kemp, his mother, one aunt (Glenavee Walker), his employer (Vernon Driskoll), and a childhood friend.  And he went to Houston, Missouri, where Kemp spent part of his childhood.  Trial counsel tried several times to interview Kemp's brother.  He went to Brad's house and telephoned him.  When Brad didn't want to talk, counsel asked Lillie to intervene. Brad still refused to cooperate.  He was starting a new job and fed up with his brother's drinking and petty crimes.  Brad was unequivocal, telling counsel that he "wanted Tim Kemp to die."  Hearing Record, 710.

On his lawyers' motion, the Arkansas State Hospital evaluated Kemp for competency. His IQ tests showed intellectual ability in the low average range and his neurological examination was normal with no further testing recommended. Kemp's counsel also successfully moved the trial court to appoint Dr. Moneypenny for an independent psychological exam.

Kemp's lead lawyer uncovered several incidents of abuse from those who lived through it—Lillie and Kemp. He didn't fail to act on what he found. This mitigation evidence came in through Lillie's testimony and Dr. Moneypenny's. And it was convincing. The first jury unanimously found the mitigating circumstance that Kemp grew up in an environment of abuse and alcoholism. Trial Record, 1966, 1970, 1974, 1978. Moreover, in a handwritten notation, the jury unanimously found a mitigating circumstance that Kemp "grew up in an environment where his father provided an example of extreme violent reactions to situations." Trial Record, 1966, 1970, 1974, 1978. At resentencing, one or more jurors , though less than all, concluded that Kemp grew up in an environment of abuse and alcoholism. Resentencing Record, 1197, 1201, 1205.

At the evidentiary hearing, Dr. Brown testified that Kemp's intellectual deficits, delay in developing motor skills, and memory deficits should have alerted his lawyer to the possibility of a fetal alcohol effects (or partial fetal alcohol syndrome) diagnosis. Lillie's 1984 DWI was also on this expert's list. It's unclear whether Lillie told Kemp's lawyer about the DWI. Kemp now faults the prosecutor for not turning it over. Appendix A, Claim IV.E, IX.B, and XVII. Kemp also presented evidence that, at the time of Kemp's 1994 trial and 1997 resentencing, a capital defense lawyer should have been aware of the fetal-alcohol-related disorder's mitigating effect.

This record contained hints, though, not red flags. There just wasn't enough evidence to show that Kemp's lawyers failed to act on a potential fetal alcohol effects (or partial fetal alcohol syndrome) diagnosis. What was missing in 1994 and 1997 was any solid indication that Lillie drank alcohol heavily while pregnant. She was mum on this. Fetal alcohol exposure was in the air as a possible mitigator by 1994. *E.g., Miller v. State*, 328 Ark. 121, 125-27, 942 S.W.2d 825, 827-29 (1997); *State v. S.S.*, 840 P.2d 891, 898-99 (Wash. App. 1992). And lead trial counsel attended the 1991 NAACP Legal Defense Fund Airlie Conference, which included a plenary session on this

developing defense.  It's also undisputed, however, that there's been more education, and increased awareness of the effects of fetal alcohol exposure, along with the development of diagnostic criteria, since the mid-1990s. Petitioner's Exhibit 91 at 1-3; Exhibit 94 at 56-59.  Viewed in context, lead counsel's not pursuing fetal-alcohol-related issues on the record he confronted in 1994 and 1997 does not create a substantial claim of deficient performance. *Martinez*, 132 S. Ct. at 1318.

There were more signs in the original record of post-traumatic stress disorder than the effects of fetal alcohol exposure.  Dr. Woods testified at length about PTSD indicators available to Dr. Moneypenny—Kemp's experiencing deja vu, blacking out, missing developmental milestones, having a poor working memory, being severely abused, and showing avoidance and over-sensitivity in a personality test.  Dr. Moneypenny concluded, however, that Kemp's actions on the night of the shooting were influenced by an antisocial personality disorder and intoxication.  He based this diagnosis on his  interviews with Kemp and Lillie, as well as Kemp's State Hospital records.  Dr. Moneypenny testified during the penalty phase that Kemp was angrier and more hostile than the average person, more

sensitive to slights and insults, and likely to numb his responses as a way of coping with terror. Trial Record, 1904-05. Kemp's lawyer tried hard to elicit this same testimony from Dr. Moneypenny at resentencing. Dr. Moneypenny's testimony there was that Kemp got more upset than most people and became overwhelmed with frustration and anger. Resentencing Record, 1054-56.

Dr. Moneypenny's diagnosis of antisocial personality disorder was not so lacking in factual basis that Kemp's lawyer's work was constitutionally defective. *Worthington v. Roper*, 631 F.3d 487, 502 (8th Cir. 2011). Many of the PTSD indicators are similar to those for antisocial personality disorder. Without the diagnosis or the label, the essence of PTSD was put before the juries in Dr. Moneypenny's testimony as well as the abuse evidence. And counsel argued during the penalty phase that, because of the abuse, Kemp didn't know how to empathize, and his ability to act rationally was impaired. Trial Record, 1950-53. Though intoxication was the focus, counsel made this same point in passing at resentencing. Resentencing Record, 1182-83, 87. It had some traction. One or more jurors in each penalty proceeding found that Kemp committed the murders "under extreme mental or emotional

disturbance." Trial Record, 1966, 1970, 1974, 1978; Resentencing Record, 1197, 1201, 1205.

Counsel's "decision not to seek more mitigating evidence from [Kemp's] background than was already in hand fell within the range of professionally reasonable judgments." *Van Hook*, 558 U.S. at 11-12 (quotation omitted). "[T]here comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." *Van Hook*, 558 U.S. at 11. Kemp's lead counsel could reasonably conclude — at the time — that he'd reached that point. His performance was unlike the constitutionally ineffective work in *Wiggins*. There, the lawyer didn't investigate his client's background beyond a presentence investigation report and city social services records. 539 U.S. at 524.

More investigation would have revealed Lillie's drinking and more details of abuse. Kemp's counsel, however, uncovered stories of abuse from Lillie and Kemp. Brad would have been an excellent source on both issues. But he closed the door hard on helping. There was nothing to cause Kemp's lead lawyer to suspect Lillie had a drinking problem. He visited her many

times at home. She didn't tell him. One of her sisters-in-law, whom counsel drove to northeast Arkansas to interview, didn't tell him. He doesn't remember Lillie mentioning her 1984 DWI conviction. At Lillie's home, counsel didn't find her drunk, see a shelf covered in alcohol, or pass a garbage can full of empty liquor bottles and beer cans.

The information in Lillie's 2003 affidavit would have unquestionably warranted more investigation. Her many miscarriages, and excessive drinking while pregnant with Kemp, would have raised the fetal-alcohol-exposure issues. Petitioner's Exhibit 15 at 1-2. The extent of Verlon's chronic abuse, which started even before Kemp was born, would have become clear. Take two examples: skeptical about paternity, Verlon beat Lillie trying to end the pregnancy; and Verlon showed up so drunk at the hospital after Kemp's birth that he got arrested. Lillie, however, didn't reveal any of this before either trial. Instead, she told the State Hospital and Dr. Moneypenny that her pregnancy with Kemp was unremarkable. Petitioner's Exhibit 104 at 20, 75. She did describe some of Kemp's childhood abuse. And Dr. Moneypenny considered this trauma in addressing Kemp's alleged lack of capacity.

In hindsight, if Kemp's lead counsel had pressed further to collateral family members and Verlon's series of families, or done a more comprehensive records investigation, he probably would have uncovered evidence that Lillie was a heavy drinker and a fuller picture of the abuse. For example, Verlon's other sister living in northeast Arkansas knew about Lillie's drinking during pregnancy and Verlon's mean streak. Hearing Record, 560-61, 565-67, 569-75. Verlon's daughters from a prior marriage knew about Lillie's heavy drinking and Verlon's abuse. Hearing Record, 589-92, 595-600, 603; 614-16, 618-26. Those revelations, in turn, could well have led to diagnoses of fetal alcohol effects, partial fetal alcohol syndrome, or post-traumatic stress disorder.

But how hard to press Lillie, how many interviews of distant relatives to conduct, and how much research into records to do were judgment calls under the press of a quadruple murder trial. Contacting another of Kemp's aunts during counsel's visit to northeast Arkansas wouldn't have required much effort. On the other hand, getting past the bad blood between Lillie and Verlon's other wives, to reach them or their children in Illinois, Missouri, and Colorado would have been a time-consuming task with an uncertain

payoff.  Trial counsel's decisions about the investigation, while mistaken in hindsight from 2015, do not raise a substantial claim of deficient performance in 1994 or 1997. *Strickland*, 466 U.S. at 689.

Kemp's lead counsel handled this case with marginal help from one lawyer during the first trial and another at resentencing.  Co-counsel opened and closed the penalty phase, and examined Dr. Moneypenny.  Trial Record, 1850-54, 1899-1909, 1925-26, 1948-56.  Co-counsel also examined Lillie.  Trial Record, 1881-91.  She did all these things well.  This lawyer, however, didn't do much else on the case.  Co-counsel during the resentencing seems to have played only a supporting role.  He did not take any witnesses or make any arguments.  As lead counsel acknowledged at the evidentiary hearing, these circumstances were not ideal.   Arkansas law requires co-counsel in appointment cases, and the ABA Guidelines recommend co-counsel in every case — with good reason: capital defense is  a big job. ARK. CODE ANN. § 16-87-306(2)(A); ABA Guideline for the Appointment and Performance of Counsel in Death Penalty Cases 2.1 (1989).   While Professor O'Brien's description of Arkansas as a "black hole" for capital defense in the 1990s is hyperbolic, resources were limited.  Hearing Record, 1233.  Kemp's lawyers

were working in those constrained circumstances. More hands are usually better than fewer.   But the Court rejects Kemp's argument that the Constitution requires a large team of lawyers and support personnel in every case. Here, for example, Kemp's lead lawyer was able and experienced. He didn't neglect this case. He did his job adequately, though imperfectly, with modest help from co-counsel.

A final issue.   Counsel's decision to try the case approximately nine months after appointment, rather than seeking a continuance to do more background investigation, was a reasonable choice in the circumstances. The prosecution made much noise about wanting to introduce evidence of Kemp's prior uncharged felony conduct. Trial Record, Defense Exhibit No. 2. The trial court blocked this effort—but did so based on a legal mistake. Trial Record, 257-58.  The lack of formal charges wasn't a proper basis to keep this conduct out. ARK. R. EVID. 404(b).  Deciding to move forward with trial, rather than risk reconsideration and reversal of this victory, was well within the range of reasonable judgment calls. *Strickland*, 466 U.S. at 690. The last thing the jury needed to hear was that, on other occasions, Kemp had broken Becky's nose, pulled a gun on Becky and Lillie, and dragged another

woman alongside a vehicle as he drove away angry from an argument with Becky. Trial Record, Defendant's Exhibit 2.

After a decade's worth of work by many good lawyers, the record overflows with proof about Kemp's extremely troubled background and significant mental challenges. All the new evidence would not have made any difference on the capacity-related guilt issues. It probably would have made a difference in Kemp's sentences. His lead trial lawyer, however, didn't stumble in the constitutional sense by not turning up all this new evidence. *Martinez* and *Trevino* therefore do not open the door to defaulted ineffective assistance claims considered at the hearing. Claims I.A, B; XI.C, D, E, part of F; and XII.A, B, C, and part of G, fail.

**5. Claim Of Actual Innocence.** Kemp argues that he's actually innocent of capital murder. His main point here is twofold: he lacked the mental capacity to commit the crime; or he has solid affirmative defenses. Kemp argues, alternatively, that he's innocent of the death penalty based on the undisclosed evidence. This is Claim V.

Actual innocence can be a gateway for Kemp's defaulted claims in certain circumstances. He must establish, based on new and reliable

evidence, that "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). Similarly, Kemp can challenge his innocence on the penalty if he shows, with clear and convincing evidence that "but for a constitutional error, no reasonable juror would have found [him] eligible for the death penalty under the applicable state law." *Sawyer*, 505 U.S. at 336. The Supreme Court hasn't decided whether a freestanding claim of actual innocence "would render unconstitutional a conviction and sentence that is otherwise free of constitutional error." *Dansby*, 766 F.3d at 816. This Court need not reach that issue. Kemp hasn't shown that no reasonable juror would have voted to find him guilty of capital murder. And he hasn't shown that no reasonable juror would have found him eligible for the death penalty. Claim V fails.

*   *   *

Kemp's second amended petition for habeas corpus relief, № *81*, will be dismissed with prejudice. Reasonable judges could disagree about this Court's conclusion on three issues. 28 U.S.C. § 2253(c)(2); *Tennard v. Dretke*,

542 U.S. 274, 292 (2004).  The Court therefore grants Kemp a certificate of

appealability on those issues:

- Was Kemp's lawyers' work constitutionally defective in not investigating fetal-alcohol exposure, or in not presenting facts about this issue in mitigation?

- Was Kemp's lawyers' work constitutionally defective in not investigating Kemp's childhood abuse further, or in not presenting more abuse evidence in mitigation?

- Was Kemp's lawyers' work constitutionally defective in not investigating post-traumatic stress disorder, or in not presenting facts about this issue  in mitigation?

So Ordered.

*WM Marshall Jr.*

D.P. Marshall Jr.
United States District Judge

*6 October 2015*

# APPENDIX A

I.   Kemp was denied the effective assistance of counsel at the guilt phase

A.   Failure to adequately investigate and present Kemp's affirmative defense of not guilty by reason of mental disease and defect

B.   Failure to ensure the appointment of a qualified and effective mental health expert

C.   Failure to impeach witness Bill Stuckey

D.   Failure to discover and present evidence supporting Kemp's claims of self-defense, imperfect self-defense, and extreme emotional disturbance

E.   Failure to investigate and challenge the competency to testify of the prosecution's key witness, Becky Mahoney

F.   Failure to impeach Mahoney's testimony

G.   Failure to investigate and present Mahoney's criminal record

H.   Failure to secure an imperfect self-defense instruction

I.   Failure to object to or rebut forensic medical examiner's testimony and prosecution's misleading argument that Wayne Helton's facial wound was consistent with having been shot at close range while Helton was lying on his back

J.   Failure to protect Kemp from prosecutorial misconduct

K.   Failure to object to admission of Mahoney's 911 call

L.   Failure to ensure a fair and impartial jury

II.     Kemp was denied the effective assistance of a competent mental health expert

III.    The prosecution's key witness, Mahoney, was not competent to testify

IV.     Kemp was denied a fair trial by misconduct of the prosecutors during the guilt phase

      A.     Improper argument

      B.     Failure to disclose material exculpatory statements by Mahoney and Stuckey supporting Kemp's defense theory

      C.     Knowing presentation of false testimony

      D.     Failure to disclose results showing gunshot residue on three victims' hands

      E.     Failure to disclose exculpatory evidence

V.      Kemp is actually innocent of capital murder

VI.     Kemp's constitutional rights were violated by the erroneous admission of Mahoney's 911 call

VII.    The trial court's failure to excuse for cause jurors who were unqualified to serve denied Kemp his right to a fair and impartial jury in violation of his constitutional rights

VIII.   Kemp's death sentences are supported solely by unconstitutionally vague, overbroad, and unworkable aggravating circumstances that lack evidentiary support

IX.     Kemp was denied a fair trial by misconduct of the prosecutors during resentencing

A.   Improper argument

B.   Failure to disclose material exculpatory evidence

C.   Knowing presentation of false testimony

X.   Kemp's 1997 death sentences are based on inadmissible predictions of his future dangerousness and improper arguments at resentencing in violation of his constitutional rights

XI.   Trial counsel rendered constitutionally ineffective assistance at the penalty phase of Kemp's 1994 trial

A.   Withdrawal of objection to victim-impact testimony

B.   Failure to introduce Kemp's exculpatory statement to police

C.   Presentation of Dr. James Moneypenny's testimony about Kemp's diagnosis of substance abuse and personality disorder with antisocial traits

D.   Failure to provide Dr. Moneypenny with an adequate history

E.   Failure to adequately investigate and present evidence in mitigation

F.   Failure to protect Kemp's rights during trial and to preserve errors for appeal

XII.   Trial counsel rendered constitutionally ineffective assistance at Kemp's resentencing proceeding

A.   Failure to investigate, develop, and present mitigating evidence

B.   Presentation of Dr. Moneypenny's testimony about Kemp's diagnosis of substance abuse and personality disorder with antisocial traits

C.   Failure to provide Dr. Moneypenny with an adequate history

D.   Failure to object to victim-impact testimony

E.   Failure to impeach Stuckey

F.   Failure to investigate and challenge Mahoney's competency or impeach her

G.   Failure to protect Kemp's rights during resentencing and preserve errors for appeal and post-conviction proceedings

XIII.   Arkansas's capital murder and death penalty statutes violate the U.S. Constitution

XIV.   Kemp was denied the effective assistance of counsel as well as conflict-free counsel, on direct appeal

XV.   Kemp was deprived of his right to effective assistance of counsel during his first state post-conviction proceeding

XVI.   The Court should conduct a cumulative assessment of whether constitutional errors occurred and whether those errors were prejudicial

XVII.   Kemp was denied a fair trial by misconduct of the prosecutors at the penalty phase of the 1994 trial, primarily based on the failure to disclose exculpatory evidence